JS-6

O

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  IN RE: WALLDESIGN, INC.,)      Case No. SACV 15-00167-VAP
    A SUBCHAPTER S         )      Case No. SACV 14-01724-VAP
12  CORPORATION.           )
                           )      USBC Case No. 8:12-bk-10105-
13  _____      CB

14                                **ORDER (1) REVERSING THE
                                  BANKRUPTCY COURT'S DECISION**
15                                **AND REMANDING FOR FURTHER
                                  PROCEEDINGS; AND (2)**
16                                **ADMINISTRATIVELY CLOSING
                                  CASE NUMBER 8:14-CV-01724**
17

18

19      Michael Bello ("Bello") was the sole shareholder,

20  sole director, and president of Walldesign, Inc.

21  ("Walldesign"), a California corporation.  Bello opened a

22  bank account in Walldesign's name but kept it secret from

23  others at Walldesign.  He covertly placed Walldesign

24  funds into this account and spent them on his personal

25  expenses.

26

27      In total, Bello made approximately $8 million in

28  payments from the account to approximately 130

individuals or entities.  None of these payments were for Walldesign.  As part of these payments, Bello gave over $220,000 to Appellees Donald F. Buresh and Sharon J. Phillips ("Buresh & Phillips") to purchase the real property where the Bello Family Vineyard, LLC tasting room is located.

Walldesign filed its Chapter 11 petition for relief on January 4, 2012.  The Official Committee ("the Committee") of Unsecured Creditors of the Estate of Walldesign, was appointed on January 26, 2012.[1]  The Committee brought 96 separate adversary proceedings to recover payments Bello made from the secret account, including the payments to Buresh & Phillips.

Buresh & Phillips filed a motion for partial summary judgment against the Committee on June 19, 2014.  The Bankruptcy Court granted that motion, and the Committee timely filed the instant appeal.

The Court finds that oral argument is not necessary to resolve the appeal.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the briefs submitted by both sides, and reviewing the record, the Court REVERSES the

---

[1]Brian Weiss is now the acting trustee of the Walldesign Liquidation Trust, which is the successor-in-interest to the rights of the Committee.  (Opening Br. at 4 n.4.)  The Court considers the Committee the Appellant for ease of reference.

1  decision of the Bankruptcy Court, and REMANDS for further
2  proceedings.

3

4                          **I. BACKGROUND**

5      The Bankruptcy Court held that Buresh & Phillips were
6  subsequent transferees under 11 U.S.C. § 550(a)(1), and
7  that they accepted the payments for value, in good faith,
8  and without knowledge of the payments' voidability. (See
9  E.R. at 958-59.)[2]  The Committee, therefore, could not
10 recover the payments from them.

11

12     In this appeal, the Committee filed its opening brief
13 on May 4, 2015. (See Doc. No. 8 ("Opening Br.").)
14 Buresh & Phillips filed their responsive brief on May 18,
15 2015. (See Doc. No. 9 ("Responsive Br.").)  The
16 Committee filed its reply brief on June 1, 2015. (See
17 Doc. No. 12 ("Reply Br.").)[3]

18 _____

19     [2]Citations to the Committee's excerpts of record (see
   Doc. Nos. 8-1 to 8-4) are as follows: "E.R. at [page
20 number]."

21     [3]On May 18, 2015, Buresh & Phillips also filed a
   Motion to Strike Portions of Appellant's Opening Brief.
22 (Doc. No. 10 ("Motion to Strike").)  The Committee filed
   an opposition on May 22. (Doc. No. 11.)
23     In the Motion to Strike, Buresh & Phillips request
   that the Court strike a footnote in the Committee's
24 Opening Brief because it references an exhibit that is
   not a part of the record on appeal. (Motion to Strike at
25 2.)  The exhibit is a transcript of oral argument at the
   Bankruptcy Court, which did not involve Buresh &
26 Phillips, and which occurred after the Committee filed
   the original notice of appeal in this case (see Case No.
27 8:14-cv-01724-VAP).
       The footnote and the cited exhibit contain only
28                                            (continued...)

                                3

1   This Court has appellate jurisdiction pursuant to 28
2   U.S.C. § 158(a)(1).  The Bankruptcy Court certified the
3   order as final and immediately appealable pursuant to
4   Federal Rule of Civil Procedure 54(b).  (See E.R. at 987-
5   91 ("Order").)

## II. LEGAL STANDARD

8   A "district court functions as an appellate court in
9   reviewing a bankruptcy decision and applies the same
10  standards of review as a federal court of appeals."  In
11  re Crystal Props., Ltd., 268 F.3d 743, 755 (9th Cir.
12  2001) (quoting another source).  Accordingly, "[a]
13  district court reviews a bankruptcy court's conclusions
14  of law and interpretation of the Bankruptcy Code de
15  novo."  In re Orange Cnty. Nursery, Inc., 439 B.R. 144,
16  148 (C.D. Cal. 2010).  It reviews factual findings for
17  clear error, and it "must accept the bankruptcy court's
18  findings of fact unless, upon review, the court is left
19  with the definite and firm conviction that a mistake has
20  been committed by the bankruptcy judge."  In re Greene,
21  583 F.3d 614, 618 (9th Cir. 2009) (citing Latman v.
22  Burdette, 366 F.3d 774, 781 (9th Cir. 2004)).

---

26  [3](...continued)
    irrelevant information.  Moreover, the cited exhibit was
    not designated as part of the record on appeal.  See,
27  e.g. Credit Alliance Corp. v. Idaho Asphalt Supply, Inc.
    (In re Blumer), 95 B.R. 143, 147 (B.A.P. 9th Cir. 1988).
28  The Court, therefore, GRANTS the Motion to Strike.

**III. FACTS**

The facts are not in dispute.

**A.   Walldesign**

Walldesign, established in 1983, is a California
corporation.  (Responsive Br. at 4.)  Until 2012, it
installed drywall, insulation, acoustical material, and
plaster, and provided construction-related services to
single and multi-family housing projects in California,
Nevada, and Arizona.  (Id. at 5.)  It maintained its
primary bank account at Comerica Bank in El Segundo,
California ("the Comerica Account").  (Id. at 4-5.)

Bello was Walldesign's sole shareholder, sole
director, and president.  (Opening Br. at 4.)

**B.   The Secret Account**

On November 1, 2002, Bello opened a different bank
account in Walldesign's name at Preferred Bank in Irvine,
California ("the Secret Account").  (Id. at 4.)  He used
Walldesign's Federal Tax I.D. Number, a Statement by
Domestic Stock Corporation, Walldesign's Articles of
Incorporation, a Unanimous Consent of Shareholder of
Walldesign to Corporate Action, and a signature card
granting him signing authority as an agent of Walldesign
to open the Secret Account.  (See E.R. at 873-88.)  He
also used his personal residence as the Account's

1  address, did not disclose the Account in Walldesign's
2  general ledger or other books and records, and made his
3  wife – who was not a Walldesign employee – a signatory to
4  the Account.  (Responsive Br. at 5.)
5
6      Walldesign purchased materials for its business in
7  bulk, and its suppliers occasionally issued rebates or
8  refunds for these purchases.  (<u>Id.</u> at 6.)  Rather than
9  deduct the refund or rebate from the total invoice, the
10 suppliers issued checks to Walldesign for the difference.
11 (<u>Id.</u>)  Bello did not deposit these checks into the
12 Comerica Account; instead, he deposited them into the
13 Secret Account and actively concealed the deposits from
14 Walldesign's management and employees, its creditors, and
15 the Bankruptcy Court.  (<u>Id.</u>)[4]
16
17     Bello used the money in the Secret Account to cover
18 expenses unrelated to Walldesign, including operating
19 costs for Bello Family Vineyard, a winery, and Michael
20 Bello LLC, a horseracing stable, as well as other
21 entities he controlled; his Las Vegas casino bills; his
22 personal expenses charged on his American Express credit
23 card; and his homeowners' association and country club
24
25 _____

26     [4]After it filed a voluntary Chapter 11 petition,
   Walldesign filed its Schedules and Statements of
   Financial Affairs, executed by Bello under penalty of
27 perjury, with the Bankruptcy Court.  (Opening Br. at 4
   n.5.)  Bello did not disclose the Secret Account on these
28 Schedules.  (<u>Id.</u>)

6

fees for two private golf courses.  (<u>Id.</u>)  In total,
Bello made approximately $8 million in payments from the
Secret Account to about 130 persons or entities.  (<u>Id.</u> at
6-7.)  None of the funds from the Secret Account were
spent for Walldesign purposes.  (<u>Id.</u> at 7.)

**C.   Buresh & Phillips**

     Buresh & Phillips are a married couple who owned the
real property located at 929 Main Street, St. Helena,
California ("the Property").  (<u>Id.</u>)  They agreed to sell
the Property to Bello so they could pay personal debts
and fund their retirement.  (<u>Id.</u>)

     Between June 24, 2009 and October 29, 2011, Bello
made several payments, totaling over $220,000, to Buresh
& Phillips to purchase the Property, which became the
site of the Bello Family Vineyard tasting room.  (Opening
Br. at 5.)  Bello made these payments using checks drawn
on the Secret Account.  (<u>Id.</u>)  These checks bore the name
"WALLDESIGN INCORPORATED."  (<u>Id.</u>)

**IV. DISCUSSION**

     The Committee presents two questions on appeal.  The
first is whether Buresh & Phillips constitute "initial
transferees" under § 550(a)(1).  Only if they are not
initial transferees, and are instead subsequent
transferees, must the Court address the second question:

7

whether Buresh & Phillips accepted the payments from
Bello in good faith and without knowledge of the
voidability of those transfers.  (See Opening Br. at 2-3;
Responsive Br. at 2-3.)

The Court holds Buresh & Phillips are initial
transferees under § 550(a)(1), for the reasons set forth
below.

**A.   Defining "Initial Transferee"**

Under the Bankruptcy Code, a trustee of the debtor
may recover a fraudulent transfer of estate property from
either "(1) the initial transferee of such transfer or
the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial
transferee."  See Schafer v. Las Vegas Hilston Corp. (In
re Video Depot, Ltd.), 127 F.3d 1195, 1197 (9th Cir.
1997) (quoting 11 U.S.C. § 550(a)).

The distinction between an "initial transferee" and a
subsequent transferee is critical.  See id.  "The
trustee's right to recover from an initial transferee is
absolute."  Id. at 1197-98 (quoting Danning v. Miller (In
re Bullion Reserve), 922 F.2d 544, 547 (9th Cir. 1991)).
A subsequent transferee, on the other hand, has a
defense.  A trustee may not recover from a subsequent
transferee if "the subsequent transferee accepted the

transfer for value, in good faith, and without knowledge of the transfer's voidability." Id. at 1198; see also 11 U.S.C. § 550(b)(1).  Therefore, if Buresh & Phillips are initial transferees, the Committee has an absolute right to recover the transfers at issue.

"Section 550(a) does not define the phrase 'initial transferee.'"  In re Incomnet, Inc., 463 F.3d 1064, 1069 (9th Cir. 2006).[5]  Over the years, judges have crafted two distinct tests to determine whether a party is an "initial transferee" under § 550(a)(1): the "dominion test" and the "control test."  Id.  The Ninth Circuit has explicitly adopted the dominion test; it has declined to adopt the control test.  See id. at 1070.[6]

---

[5]The Bankruptcy Code defines "transfer" broadly to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with: (i) property; or (ii) an interest in property."  11 U.S.C. § 101(54).  Courts generally do not, however, treat the terms "transfer" and "initial transferee" as conterminous.  See, e.g. Bonded Fin. Servs. Inc. v. European Am. Bank, 838 F.2d 890, 894 (7th Cir. 1988) ("'Transferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent'.  To treat 'transferee' as 'anyone who touches the money' and then to escape the absurd results that follow is to introduce useless steps . . . .").

[6]Buresh & Phillips contend that In re Incomnet only "adopted the dominion test in the context of determining whether a defendant was a 'transferee' or 'mere conduit,'" and therefore the dominion test "is irrelevant in the instant case." (Responsive Br. at 16.)  In In re Incomnet, however, the Court stated that "the dominion test remains a test to determine whether a recipient of funds is a transferee for purposes of the bankruptcy code, and this inquiry is not limited to the context of
(continued...)

9

1    "Under the dominion test, a transferee is one who has
2    dominion over the money or other asset, the right to put
3    the money to one's own purposes."  _Id._ (citation,
4    quotation marks, and alterations omitted).  The test
5    focuses on whether someone "had legal authority over the
6    money and the right to use the money however" desired –
7    for example, to invest the money in "lottery tickets or
8    uranium stocks."  _Id._ at 1070, 1073.  The control test,
9    on the other hand, "takes a more gestalt view of the
10   entire transaction to determine who, in reality,
11   controlled the funds in question."  _Id._ at 1071.
12
13       The leading case on the dominion test, _Bonded_
14   _Financial Services_, crafted it with policy considerations
15   in mind.  _See_ _Bonded Fin. Servs. Inc. v. European Am._
16   _Bank_, 838 F.2d 890, 893 (7th Cir. 1988).  Initial
17   transferees are "the best monitor[s]" of fraudulent
18   conveyances, it stated.  _Id._ at 892-93.  This status
19   renders them defenseless to a trustee's right to recover
20   fraudulent conveyances.  _Id._  "[S]ubsequent transferees,"
21   on the other hand, "usually do not know where the assets
22   came from and would be ineffectual monitors if they did."
23   _Id._  They, therefore, have a defense.
24
25
26   ────────────────────
27       [6](...continued)
     'conduit cases.'"  _In re Incomnet, Inc._, 463 F.3d at 1073
28   n.11.

1    In its most recent statement on the issue, the Ninth
2 Circuit Court of Appeals echoed these considerations.
3 See Mano-Y&M, Ltd. v. Field (In re The Mortgage Store),
4 773 F.3d 990 (9th Cir. 2014).   In In re The Mortgage
5 Store, the Ninth Circuit noted that "[i]n virtually every
6 case involving a bankrupt entity, a third party will be
7 injured because the debtor's obligations to creditors, by
8 definition, outstrip its assets."   Id. at 997.   The
9 "injury must fall on either the transferee of the
10 conveyance or the debtor's creditors."   Id.   A court's
11 aim in these cases "must be to allocate risk such that
12 the parties tending to have the lowest monitoring costs
13 [] bear the costs of a debtor's failings."   Id. (citing
14 Bonded Fin. Servs., 838 F.2d at 892-93).   Congress
15 determined that initial transferees have the lowest
16 monitoring costs, and it therefore placed the risk of
17 fraudulent conveyances on them rather than creditors.
18 Id.

19

20    The In re The Mortgage Store Court further noted that
21 "it is unreasonable to assume" a long-time president of a
22 corporation from where a transfer came "has the proper
23 incentives to monitor [that corporation] for fraud. . . .
24 Charging a party with monitoring for fraud the entity
25 that pays its debts would undermine the very structure of
26 § 550."   Id. at 998 n.1.

27

28

1      This notion is not novel.  The Ninth Circuit in <u>In re</u>
2  <u>Video Depot</u> earlier adopted the view that "[t]he mere
3  power of a principal to direct the allocation of
4  corporate resources does not amount to legal dominion and
5  control."  127 F.3d at 1199 (citing <u>Bowers v. Atlanta</u>
6  <u>Motor Speedway, Inc. (In re Se. Hotel Properties Ltd.</u>
7  <u>P'ship)</u>, 99 F.3d 151, 156 (4th Cir. 1996)).[7]  Many
8  principals of corporations "exercise <u>de facto</u> control
9  over the funds of the corporations they manage," it
10  stated.  <u>Id.</u> (quoting <u>Bowers</u>, 99 F.3d at 156).  These
11  principals "can choose to cause their corporations to use
12  those funds appropriately or inappropriately.  The
13  distinction is only relevant to the question whether the
14  principal's conduct amounted to a breach of duty to the
15  corporation."  <u>Id.</u> (quoting <u>Bowers</u>, 99 F.3d at 156).  It
16  is not relevant to whether the principal is an initial
17  transferee.  A rule making "every agent or principal of a
18  corporation . . . the initial transferee when he or she
19  effected a transfer of property in his or her
20  representative capacity" would give "too much power to an
21  unscrupulous insider to effect a fraudulent transfer."
22  <u>Id.</u>

---

[7]Although the <u>In re Video Depot</u> Court made this
statement while summarizing other decisions, it sided
with these decisions, and therefore adopted their
reasoning.  <u>In re Video Depot, Ltd.</u>, 127 F.3d at 1199
(declining "to depart from the considered judgment of
the[se] other circuits").

1    The <u>In re Video Depot</u> Court "conclude[d] that [a
2  principal's] control over the business operations of [the
3  corporation] does not, in itself, compel a finding that
4  [the principal] had dominion and control over the funds
5  transferred from the [the corporation] to [a third
6  party]."  <u>Id.</u> at 1199-1200.

7

8    As these cases demonstrate, a corporation's principal
9  who effects a transfer from the corporation in his
10 representative capacity does not have dominion over those
11 funds in his personal capacity, and therefore does not
12 constitute an initial transferee of those funds under the
13 Bankruptcy Code.

14

15 **B.   Applying the Definition of "Initial Transferee"**
16    Applying this definition of "initial transferee," the
17 Court holds that Bello was not the initial transferee.
18 Bello did not have dominion over the funds in the Secret
19 Account except in his capacity as a Walldesign
20 representative.  Moreover, he was the sole shareholder
21 and president of Walldesign, and he therefore did not
22 have the proper incentives to monitor Walldesign for
23 fraud.  Considering him the initial transferee of a
24 transfer from Walldesign would undermine the structure of
25 § 550(a)(1).  Accordingly, the initial transferee mantle
26 does not belong to Bello – it belongs to Buresh &
27 Phillips.

28

1    Courts have suggested that a corporate principal's
2  transfer of corporate funds into a personal bank account
3  may afford the principal dominion over those funds.  See
4  In re Video Depot, 127 F.3d at 1199.  The Secret Account
5  was not, however, Bello's personal bank account.  Bello
6  opened it in Walldesign's name as a Walldesign
7  representative, and he deposited Walldesign funds into
8  the Account.  The checks issued from the Secret Account
9  bore the title, "WALLDESIGN INCORPORATED."

10

11    Buresh & Phillips point to several facts to show that
12  the Secret Account was Bello's personal account: nobody
13  from Walldesign except Bello knew about the Secret
14  Account; Bello used his personal address to open it; and
15  his wife – who was not a Walldesign employee – was a
16  signatory to the Account.

17

18    On the other hand, Bello used Walldesign's Federal
19  Tax I.D. Number, a Statement by Domestic Stock
20  Corporation, Walldesign's Articles of Incorporation, a
21  Unanimous Consent of Shareholder of Walldesign to
22  Corporate Action, and a signature card granting him
23  signing authority as an agent of Walldesign to open the
24  Secret Account.  (See E.R. at 873-88.)  Hence, the Secret
25  Account was a Walldesign account.

26

27

28

                                14

Although the transfers Bello made from the Secret Account were improper and breached his duty to the corporation, he effected them in his capacity as a Walldesign representative.  He did not, therefore, have dominion over the funds in the Secret Account in his personal capacity, _i.e._, he was not the initial transferee.

**C.   The Cases Relied on by Buresh & Phillips Do Not Require a Different Outcome**

Buresh & Phillips rely primarily on two cases decided by the Ninth Circuit Bankruptcy Appellate Panel ("B.A.P."): In re Dominion Corp., 199 B.R. 410 (B.A.P. 9th Cir. 1996); and In re Dietz, 94 B.R. 637 (B.A.P. 9th Cir. 1988), aff'd on other grounds, 914 F.2d 161 (9th Cir. 1990).  Decisions of the B.A.P. are subordinate to decisions of the Ninth Circuit Court of Appeals.  See In re The Mortg. Store, 773 F.3d at 995-96 ("Although we treat the BAP's decisions as persuasive authority, we are not bound by its decisions.  In fact, as the BAP has recognized, our decisions are binding precedent that the BAP must follow.").  To the extent these decisions conflict with In re The Mortgage Store and In re Video Depot, the Court declines to follow them.

In any event, these decisions are distinguishable. In re Dominion Corp. relies on In re Dietz in relevant

1  part, see In re Dominion Corp., 199 B.R. at 415, so the
2  Court focuses on In re Dietz.

3

4      In In re Dietz, Lelon D. Dietz, doing business as
5  ("DBA") both Com-Group Portland ("Com-Group") and
6  Airbrush Digest Publishing ("Airbrush"), filed for
7  bankruptcy protection.  In re Dietz, 94 B.R. at 638.
8  "[T]he designation [DBA] means 'doing business as' but is
9  merely descriptive of the person or corporation who does
10  business under some other name.  Doing business under
11  another name does not create an entity distinct from the
12  person operating the business." Pinkerton's, Inc. v.
13  Superior Court, 49 Cal. App. 4th 1342, 1348 (1996)
14  (citing Providence Washington Ins. Co. v. Valley Forge
15  Ins. Co., 42 Cal. App. 4th 1194, 1200 (1996)) (citations,
16  internal quotations, and emphasis omitted).

17

18     The bankruptcy court authorized the trustee to
19  operate Com-Group and Airbrush.  In re Dietz, 94 B.R. at
20  638.  The trustee chose to operate only Com-Group.  Id.
21  Dietz then secretly "opened a checking account with a
22  Virginia bank," deposited funds he borrowed from his
23  fiancé into the account, and began operating Airbrush.
24  Id. at 638-39.  He deposited Airbrush funds into the
25  account.  Id. at 639.

26

27

28

The B.A.P. concluded Dietz constituted the initial transferee of those funds.  Since Dietz was "doing business as" Airbrush, there was no truly separate corporate entity.  The account was, therefore, properly considered his personal checking account.

As discussed above, the Secret Account in this case was not Bello's personal checking account.  <u>In re Dietz</u> is distinguishable and does not support the position advanced by Buresh & Phillips.

**D.   The Proper Role of Equitable Principles**

Buresh & Phillips argue that equitable principles are relevant to the determination of who is the initial transferee, and that the consequences of considering them initial transferees are too harsh.  (<u>See</u> Responsive Br. at 17 n.88.)  The Supreme Court in discussing the Bankruptcy Code has, after all, declined to "read the[] statutory words with the ease of a computer.  There is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction."  <u>Bank of Marin v. England</u>, 385 U.S. 99, 103 (1966).

Although "the result this case produces may seem harsh," the Ninth Circuit has stated that "Congress' intent in enacting § 550" must govern.  <u>In re The Mortg. Store</u>, 773 F.3d at 997.  Congress placed the risk of

fraudulent conveyances on initial transferees because
they are in the best position to monitor fraud.  <u>Id.</u>
Bello – as a Walldesign principal – did not have the
proper incentives to monitor Walldesign for fraud.  <u>Id.</u>

     Moreover, as the <u>Bonded Financial Services</u> Court
stated,

     We have serious doubts . . . about the propriety
     of judges' declining to enforce statutes that
     produce inequitable results.  Bankruptcy
     statutes are not special cases. . . . [T]his
     appeal to "equity" – to deny recovery against an
     "initial transferee" within the statute – is
     different in source and scope from the way in
     which we have employed considerations of policy
     to <u>define</u> "transferee" under § 550(a)(1).

<u>Bonded Fin. Servs.</u>, 838 F.2d at 894-95 (internal
citations omitted) (emphasis in original); <u>see also</u>
<u>Richardson v. FDIC (In re M. Blackburn Mitchell, Inc.)</u>,
164 B.R. 117, 131-32 (Bankr. N.D. Cal. 1994).

     Courts have considered equitable principles in
defining the term "initial transferee" under § 550(a)(1),
and this Court has taken those principles into account.
It cannot employ equitable principles to reach a

1  particular result, despite the statute's terms and in

2  contravention of Congress' intent, as Buresh & Phillips

3  request.

4

5                    **V. CONCLUSION**

6      The Court holds Buresh & Phillips (and not Bello)

7  constitute initial transferees under § 550(a)(1).  The

8  Court REMANDS the case to the Bankruptcy Court for

9  further proceedings.  This Order administratively closes

10 the related case, case number 8:14-cv-01724.

11

12 Dated:  _July 17, 2015_          _____

13                                  VIRGINIA A. PHILLIPS
                                    United States District Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28